IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| TAMMY WHITE,<br><br>             Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY<br>ADMINISTRATION,<br><br>             Defendant. | CASE NO. 1:23-cv-1380<br><br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Plaintiff Tammy White filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits and supplemental security income. This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 5. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural background**

In February 2020, White filed an application for disability insurance benefits and supplemental security income alleging a disability onset date of December 23, 2019.[1] *E.g.*, Tr. 91, 331. In pertinent part, White claimed that

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

she was disabled and limited in her ability to work due to cyclic vomiting syndrome,[2] congenital heart disease, heart failure, blood clot in heart, swelling in the lower extremities, and shortness of breath. Tr. 330. The Commissioner denied White's application initially and upon reconsideration. Tr. 118, 123, 129, 134.

In October 2020, White requested a hearing. Tr. 136. Administrative Law Judge ("ALJ") Catherine Ma initially scheduled a hearing to take place in January 2021; however, after a series of continuances, a hearing was ultimately held in January 2022. Tr. 37–77. White appeared, testified, and was represented by counsel at the January 2022 hearing. Tr. 37–77. Qualified vocational expert Deborah Lee also testified. Tr. 37–77. In February 2022, the ALJ issued a written decision, which found that White was not entitled to benefits. Tr. 17–36.

In March 2023, White appealed the ALJ's decision to the Appeals Counsel. Tr. 1–5. In May 2023, the Appeals Counsel denied White's appeal, making the ALJ's February 2022 decision the final decision of the Commissioner. Tr. 1–5; *see* 20 C.F.R. § 404.981.

---

[2]      Cyclic vomiting syndrome is characterized by episodes of severe vomiting that have no apparent cause and can last for hours or days. *See Cyclic Vomiting Syndrome*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/cyclic-vomiting-syndrome/symptoms-causes/syc-20352161 [https://perma.cc/Z3HJ-893D].

White timely filed this action in July 2023. Doc. 1. In it, she asserts the following assignment of error:

> WHETHER THE ALJ ERRED IN DETERMINING THAT PLAINTIFF CAN PERFORM A FULL RANGE OF LIGHT WORK DUE TO UNDERLYING ERRORS IN THE EVALUATION OF MEDICAL OPINIONS AND LEGAL ERROR IN THE EVALUATION OF THE OBJECTIVE EVIDECE.

Doc. 9, at 1.

**Evidence**

*1. Personal and Vocational Evidence*

White was born in 1984, making her 35 years of age at the time of disability onset and 37 years of age at the time of her hearing. Tr. 46. She completed 11th grade and had relevant past work experience as a cashier II and fast-food services manager. Tr. 46.

*2. Medical Evidence*[3]

White has a congenital heart condition called Tetralogy of Fallot[4] but, as of January 2020, had been asymptomatic for the past 15 years and had felt

---

[3]    The recitation of medical evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs.

[4]    Tetralogy of Fallot is a congenital heart condition, meaning it is present at or before birth, that includes four problems with heart structure: (1) narrowing of the valve between the heart and the lungs, called pulmonary valve stenosis; (2) a hole between the bottom heart chambers, called a ventricular septal defect; (3) shifting of the aorta to attach to the right and sit directly above the hole in the heart wall; and (4) thickening of the right lower chamber of the heart, called ventricular hypertrophy. *Tetralogy of Fallot*, Mayo

"perfectly fine during this time." Tr. 424. However, in late January 2020, White was hospitalized for acute congestive heart failure after experiencing shortness of breath on exertion, fatigue, low energy, limited exercise capacity, a limited ability to lie down, lower extremity swelling, and a 15-pound weight gain over the course of one week. Tr. 425, 427. An X-ray taken at the time of her admission showed cardiomegaly with a right pleural effusion and mild volume loss in the right mid-to-lower lung zones. Tr. 423. White was started on medication and released in stable condition approximately one week later, with a follow-up cardiology appointment scheduled. Tr. 424–425. White's diagnosis at the time of discharge was acute decompensated heart failure, heart failure with reduced left ventricular function, a blood clot in her heart, pulmonary regurgitation,[5] and subclinical hypothyroidism. Tr. 424.

In February 2020, White established care with Martin Bocks, M.D. Tr. 521. At that time, she was "doing very well from [a] cardiac standpoint," with an improved energy level. Tr. 521. She denied chest pain, palpitations, shortness of breath, and dizziness. Tr. 521. However, Dr. Bocks noted that

---

Clinic, https://www.mayoclinic.org/diseases-conditions/tetralogy-of-fallot/symptoms-causes/syc-20353477, [https://perma.cc/92QZ-UWJK].

[5]     Pulmonary regurgitation, or a leaky pulmonary valve, is a condition that allows blood to flow back into the heart chamber before going to the lungs for oxygen. *Problem: Pulmonary Valve Regurgitation*, American Heart Association, https://www.heart.org/en/health-topics/heart-valve-problems-and-disease/heart-valve-problems-and-causes/problem-pulmonary-valve-regurgitation, [https://perma.cc/6Z68-XEH5].

White still required continuous therapy, should be carefully monitored, and was thought to need a pulmonary valve replacement in the future. Tr. 527–528. At a follow-up appointment in March 2020, White was noted as continuing to make progress and was "asymptomatic from [a] cardiac standpoint." Tr. 533. She had no activity restrictions and was encouraged to exercise. Tr. 534. Still, Dr. Bocks wanted her to proceed with the pulmonary valve replacement. Tr. 533.

In April 2020, White was admitted to the hospital at which time she underwent valve replacement surgery and placement of an implantable cardioverter defibrillator ("ICD"). Tr. 461, 480–486, 553. At discharge, Dr. Bocks indicated that White "may not resume work at this time" and that she had "activity restrictions on her left arm. No lifting more than 5 lbs." Tr. 554.

At a June 2020 follow-up appointment, Dr. Bocks noted that White had improved energy since the valve replacement and no significant symptoms from a cardiac standpoint. Tr. 537. Overall, he was "very pleased with the outcome of [the surgery] and expect[ed] to see further improvement in cardiac chamber size and systolic function as well as valvular disease in the future." Tr. 537. Dr. Bocks warned White against pregnancy due to her severe biventricular dysfunction but imposed no activity restrictions and encouraged her to engage in routine exercise. Tr. 537.

White returned to Dr. Bocks in October 2020, at which time he noted that her cardiac symptoms were unremarkable. Tr. 680. White, however, reported that her defibrillator shocked her about two weeks prior, after which she started a new medication. Tr. 680. Dr. Bocks categorized White's condition as Class I heart failure according to the New York Heart Association (NYHA) classification system. Tr. 680.

Also in October 2020, White saw cardiologist Eiran Gorodeski, M.D., for an advanced heart failure assessment and management appointment. Tr. 676, 678. He noted that White felt better with medication adjustments and surgeries but continued to have shortness of breath with exertion. Tr. 678. Dr. Gorodeski classified White's symptoms as NYHA Class II or III heart failure. Tr. 678.

In November 2020, White saw Dr. Gorodeski for a routine medication evaluation. Tr. 671. Dr. Gorodeski noted that White had minimal symptoms on her current regimen and advised her to continue it. Tr. 674–675.

In December 2020, White was briefly hospitalized after she was shocked by her defibrillator due to supraventricular tachycardia.[6] Tr. 579–580, 582, 601. It was noted, however, that White had forgotten to take her beta blocker

---

[6]     Supraventricular tachycardia is a type of irregular heartbeat that causes a very fast or erratic heartbeat, and which affects the upper chambers of the heart. *Supraventricular tachycardia*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/supraventricular-tachycardia/symptoms-causes/syc-20355243, [https://perma.cc/7JCV-P8BQ].

the night before the shock. Tr. 579. White was discharged in stable condition and told that she could engage in activities as tolerated. Tr. 579–580.

White returned to Dr. Bocks in January 2021. Tr. 745. She was noted as doing "relatively well" but did not exercise regularly, which Dr. Bocks noted was consistent with NYHA Class II heart failure. Tr. 745–746. White denied chest pain, palpitations, or syncope but stated she had some exertional shortness of breath when climbing stairs and on long walks. Tr. 746. Dr. Bocks indicated that White had no activity restrictions and continued to encourage routine exercise. Tr. 745.

In April 2021, Dr. Bocks completed a form, intended for pediatric cardiology assessments, in which he opined that White had a marked limitation in moving about and manipulating objects, a moderate limitation in caring for herself, and a marked limitation in her health and physical well-being. Tr. 751–754. Dr. Bocks also found that White may need accommodations "particularly related to mobility and activity" if they are requested. Tr. 753.

In June 2021, White had a routine follow-up appointment with Dr. Bocks. Tr. 880–881. White did not have any acute issues or concerns and remained categorized by Dr. Bocks as NYHA Class II heart failure. Tr. 881. Dr. Bocks continued to indicate that White had no activity restrictions and was encouraged to exercise. Tr. 881.

Later in June 2021, White was hospitalized following two shocks from her defibrillator and an adjustment was made to her medications. Tr. 843, 897, 911. At discharge, White was instructed to perform activity as tolerated. Tr. 841.

At the end of June 2021, White followed up with cardiologist Dr. Judith Mackall, who noted that the medication change had been good for White's heart rhythm, with no fast heart rates since her hospital stay. Tr. 886. White reported no present complaints and indicated that she had not been symptomatic since her hospital discharge. Tr. 886–887. She also, however, reported palpitations, lightheadedness, and shortness of breath at times. Tr. 887.

In September 2021, White underwent an atrial flutter ablation to address her symptomatic supraventricular tachycardia and ICD shocks. Tr. 1061. Also in September 2021, Dr. Bocks completed an assessment in which he opined that White could frequently lift 25 pounds, sit without restriction, stand for four hours in an eight-hour workday and one hour without interruption, perform occasional postural changes, occasional reaching, pushing, pulling and fine and gross manipulation, would need an additional 30-minute break during the day, and would need to be able to alternate between standing and sitting at will. Tr. 921–924.

In December 2021, White remained categorized by Dr. Bocks as NYHA Class II heart failure, but he noted that her polyvalvular disease was generally improved. Tr. 1070–1071. White reported chronic diarrhea, weight loss, difficulty taking deep breaths, sweating, and numbness and tingling in her legs after sitting for 15 minutes, but she denied chest pain, palpitations, or syncope. Tr. 1071. Dr. Bocks indicated that White had no activity restrictions, continued her on medications, and encouraged routine exercise. Tr. 1070.

### 3. State Agency Opinions[7]

In June 2020, Dr. Leon Hughes, reviewed White's available records and assessed White's physical residual functional capacity (RFC).[8] Tr. 93–95. Dr. Hughes found that White was capable of performing the full range of medium work. Tr. 95.

---

[7]     At the end of White's January 2022 hearing, her attorney argued that the ALJ should obtain supplemental interrogatory responses or testimony from a medical expert to consider evidence that had been presented since September 2020, when the state agency consultant's last considered White's claims. Tr. 75. Neither this argument nor any argument disputing the state agency consultants' analysis appear in White's brief.

[8]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

9

In September 2020, Dr. Gerald Klyop, reviewed White's record, including Dr. Hughes' findings.[9] Tr. 113–114. Dr. Klyop affirmed Dr. Hughes' findings and determined that White was capable of performing the full range of medium work. Tr. 113–114.

### 4. Hearing Testimony

White, who was represented by counsel, testified telephonically at an administrative hearing in January 2022. Tr. 37–77. White testified that she lived with her 73-year-old mother, who had thyroid cancer, but White did not provide care for her mother. Tr. 45. She further stated that her mother was "moving a little bit more better than I do." Tr. 45. White testified that if she or her mother needed assistance, she called her sisters or nieces who lived next door. Tr. 45.

White stated that she completed 11th Grade but had not completed high school or obtained her GED. Tr. 46. She participated in a culinary class but did not complete that class. Tr. 46. White did not obtain any other certifications or licenses. Tr. 46. White stated that she had a driver's license but did not drive

---

[9]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

long distances. Tr. 47. She confirmed that she does not have any restrictions on her license. Tr. 47.

White stated that she is not currently working or volunteering. Tr. 47. She testified that she does not have any form of income or assistance but received electronic benefit transfers through the Supplemental Nutrition Assistance Program for groceries. Tr. 48. White stated that the last time she worked was December 23, 2019. Tr. 47.

As to her work history, White testified that her most recent employment was as a part-time cashier at the VA. Tr. 48–49. White testified that in her role as a cashier at the VA, she worked in the canteen, or cafeteria, of the facility for about six months. Tr. 48. Her duties included: "ringing up customers, making sure the tables were clean, stocking juices or whatever that was needed in the cafeteria." Tr. 49. She stated that she stood at all times during this employment and that they rarely had breaks. Tr. 49. White stated that she had to lift approximately 30 pounds, but items could be placed on a cart to be moved. Tr. 50.

Next, White testified about a position through a company called Compass Group. Tr. 50–51. She testified that in her role with Compass Group, she worked in food service at Judson Park, a nursing home facility. Tr. 50–51. She worked at Judson Park for approximately six to eight months in a part-time position. Tr. 50. White explained her role in food service at Judson Park

11

included plating and providing the plated food to the nurses to be served to residents, as well as cleaning up between meals and preparing for the next meal service. Tr. 51, 52. White stated that she was required to be on her feet but that she did not have to do any extreme lifting or lift a set weight because there were other employees who would lift heavy items. Tr. 51.

White testified that in 2016 and 2017, she worked as a manager at Jimmy Johns. Tr. 52. In that role, White explained that she made sandwiches, cooked bread, sliced meat, and made sure delivery drivers received food on time. Tr. 52. She also stated that she had authority to discipline employees, but did not make hiring and firing decisions. Tr. 52. White confirmed that she was constantly on her feet in this role and she stated that the heaviest item she would have to lift at a given time was approximately 25 pounds. Tr. 52–53.

White testified that in 2013 and 2014, she worked at Chipotle in multiple roles including, grill cook, prep cook, line worker, and cashier. Tr. 53. White confirmed that she was constantly on her feet in these roles and that she would have to lift items weighing up to 60 pounds during her shifts. Tr. 54. White testified that she also worked at other Chipotle locations between 2006 and 2010. Tr. 54.

White expressed her belief that she has been unable to return to work since December 2019 because of her heart. Tr. 55. She further stated:

> I have a problem breathing. I couldn't walk a certain distance without losing my breath or to the point I'm

12

> about to pass out and then like if I stand still for a
> certain amount of time, I would feel water weight
> like coming on and I can't breathe and like I try to
> not get over excited so I don't get palpitations to my
> heart and it's just like – it's just I don't know. That's
> it.

Tr. 56. White also explained that she panicked when she felt like she could not breathe or became short of breath and that wearing a mask made it worse. Tr. 56.

White testified that she took medication for her heart, had upcoming appointments with her cardiologist and about medication, and that she had been given certain tools to help with her breathing and regulating her lungs. Tr. 57. White also stated that she was going to begin cardiology rehab in February 2022, which she was "kind of excited" to begin. Tr. 57. White confirmed that no other conditions, apart from her heart condition, limited her ability to work. Tr. 57–58.

White stated that she took care of herself, but at a slower than usual pace due to some of the procedures she has had. Tr. 58. For example, she stated that her defibrillator made her arms stiff, and that the ICD caused her legs to "lock up" if she sat for more than 10 minutes. Tr. 58. When that happened, she had to get up slowly. Tr. 58. White also testified that she was able to vacuum but had to sit down every 15 to 20 minutes, that she did some shopping, and she cooked. Tr. 58. White explained that she did most of her simple house cleaning, such as wiping up or dishes, but that her sisters or nieces came over

13

to do laundry because she got short of breath carrying the laundry basket up and down the steps. Tr. 58–59. White stated that she did not do yard work. Tr. 59.

White detailed the timeline of her day and stated that she woke up around 4:30 a.m., got out of bed around 6:30 a.m., and tried to eat something. Tr. 59. After that she would talk to her mother, or "sit there," or "try to do some work around the house." Tr. 59. She stated, however, that because of her medication, it took a while for her to "get some juice and get up and do something." Tr. 59. So, she explained, it was a "slow start" and she generally did not get up and do something until one or two in the afternoon because that was when her medicine kicked in. Tr. 60. White stated that she often spent her day playing games or watching movies with her mother, sister, and nieces or by building miniature doll houses. Tr. 60–61. She spent about 30 minutes of her day working on her doll houses. Tr. 66.

White stated that she had lost weight and now weighed approximately 113 pounds, but she typically weighed 120 pounds. Tr. 62. She also clarified that she went grocery shopping about once a month but did not go grocery shopping by herself. Tr. 63. White stated that while grocery shopping, she leaned on the cart to support herself. Tr. 64.

White further explained that the stiffness in her left arm was caused by her feeling the ICD wires when she moved and described a pressure in her

14

chest when she moved her arm back and forth to vacuum. Tr. 64. White testified that she napped throughout the day but that her naps were generally an hour or less. Tr. 65. She also explained that she had good days and bad days, but that she typically had more good days than bad days in a given week. Tr. 65–66.

White lastly stated that she currently saw her cardiologist, Dr. Bocks, every six months, but that she used to see him every three months, and that Dr. Gorodeski was the doctor who placed her ICD. Tr. 67.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2024. (Exhibit 19D).

2. The claimant has not engaged in substantial gainful activity since December 23, 2019, the alleged onset date. (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: valvular heart disease and heart failure. (20 C.F.R. 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments of 20 CFR Part 404, Subpart P, Appendix 1. (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform the full range of light work as defined by 20 CFR 404.1576(b) and 416.967(b).

6.   The claimant is capable of performing past relevant work as a cashier II and fast-food services manager. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. (20 C.F.R. 404.1565 and 416.965).

7.   The claimant has not been under a disability, as defined by the Social Security Act, from December 23, 2019, through the date of this decision. (20 C.F.R. 404.1520(f) and 416.920(f)).

Tr. 20–22, 33, 35.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1.  Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2.  Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3.  Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4.  What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the

17

duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469,

477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

In support of her sole issue presented, White makes two salient arguments: (1) "the ALJ failed to properly and accurately evaluate the persuasiveness of the medical opinions of record which conflict with a light residual functional capacity finding," and (2) "the ALJ played doctor and failed to draw a logical bridge between the evidence and her residual functional capacity." Doc. 9, at 13, 18. Both arguments are refuted by the Commissioner, Doc. 11, at 7–13, and neither provide a sufficient basis for remand.

*As to her first argument*, White asserts that the ALJ failed to comply with applicable regulations when she evaluated the medical opinions provided by two doctors, Dr. Bocks and Dr. Gorodeski. Tr. 13. In this regard, the Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)-(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective

19

medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, No. 1:19-cv-02261, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

The ALJ evaluated Dr. Bocks' medical opinions as follows:

> I have considered the opinion of Dr. Martin Bocks. After being discharged from her valve replacement and ICD surgeries in April 2020, he indicated she "may not resume work at this time" and that she had activity restriction in her left arm. He indicated she could do no lifting more than five pounds. (Exhibit 4F, page 9). This opinion is giving short-term limitations as it related to her immediate recovery

20

from these surgeries that would not reflect her functioning over the longitudinal period, as she was asymptomatic shortly after this surgery. (Exhibit 3F, pages 70, 74). Thus, this opinion is not persuasive.

I have considered another opinion of Dr. Martin Bocks. In April 2021, he completed a form meant to be used when evaluating childhood disability claims that evaluate six functional domains. In this form, he indicated the claimant had no limitations acquiring and using information, attending and completing tasks, and interacting and relating with others. He indicated she had marked limitations moving about and manipulating objects stating her heart disease would limit her activity and endurance, resulting in symptoms like shortness of breath. He found she had moderate limitations caring for herself, stating she had limitations related to activities to support her daily life, like grocery shopping, due to her health issues. He indicated she had marked limitations in health and physical well-being as her health would be affected by her heart condition, which affected her ability to complete all of her daily activities. He also provided a list of potential side effects, but made no indication the claimant actually had any of those side effects. (Exhibit 8F; Exhibit 9F, pages 27–30).

Dr. Bocks was the claimant's treating cardiologist. Obviously completing a form meant to assess a child's functioning was in error, as at all times Dr. Bocks treated the claimant the claimant was an adult. Thus, the classifications he gave related to the six functional domains were not particularly relevant in evaluating her functioning as an adult. His opinion was also not fully supported by the record. There was no indication that her symptoms were affecting her ability to complete all of her daily activities as he alleged. Records showed in December 2020 that she had returned to her normal activities. (Exhibit 5F, page 12). Dr. Bocks' own treatment

records did sometimes document she had shortness of breath with exertion. (Exhibit 7F, page 47). However, his treatment records also noted she was doing well and often noted the claimant to have no symptoms. (Exhibit 3F, pages 58, 64, 70, 74; Exhibit 5F, pages 5, 24). While she would be expected to have some degree of limitation based on her heart disorder, his opinion was fairly vague and imprecise. Thus, this opinion was not persuasive.

I have considered another opinion by Dr. Martin Bocks. In September 2021, he completed a form indication that the claimant could occasionally and frequently lift and/or carry twenty-five pounds. He indicated she could stand or walk one hour at a time and for four hours in an eight-hour workday. He indicated she could occasionally climb, balance, stoop, crouch, kneel, and crawl. He indicated she could occasionally reach, push, pull, fine manipulate, and gross manipulate. When asked "are there environmental restrictions that affect the impairments" he checked "no" for heights, moving machinery, temperature extremes, pulmonary irritants, and noise. He indicated she would need an additional thirty minute to an hour long break a day. He indicated she needed to be able to shift positions at will. (Exhibit 13F, pages 1–5). This opinion was based on claimant's cardiac testing and shortness of breath on exertion. Dr. Bocks' also cited to her "palpitations," though she typically denied having palpitations. (Exhibit 1F, page 13; Exhibit 13F, page 48; Exhibit 5F, page 5; Exhibit 7F, page 47; Exhibit 11F, page 28).  This opinion was not consistent with her physical examination findings.  For instance, there was no indication in the record that she had any focal neurological deficits or reduced range of motion that would explain why she had limited ability to reach, fine manipulate, or gross manipulate objects. There was no indication that she had any balance issues or reduced strength. There is no explanation why he believed she needed to be able to shift positions at will while simultaneously

> stating he thought she had no limitations involving sitting. Overall, this opinion was not well supported or explained and was not consistent with the treatment records. Thus, this opinion was not persuasive.

Tr. 31–32.[10]

White argues that the ALJ improperly found Dr. Bocks' April 2020 unpersuasive based on a finding that this "opinion does not reflect [White's] functioning over the longitudinal period, as she was asymptomatic shortly after this surgery." Doc. 9, at 14; Tr. 32. In support of this argument, White admits that the record showed improved symptoms after her surgery, however, she argues that the ALJ should have discussed additional evidence, which demonstrated some symptoms remained post-surgery. Doc. 9, at 14. The existence of some supporting evidence that symptoms persisted does not negate the point recognized by the ALJ–that Dr. Bocks' April 2020 opinion is inconsistent with (or "does not reflect") the broader record of medical evidence. Tr. 32; *see also Jones*, 336 F.3d at 477. Although ALJ's analysis of Dr. Bocks' April 2020 opinion does not use the magic words "supportability" or "consistency," exact wording is not a requirement, and it is apparent from the ALJ's decision as a whole that she considered these factors. *See Cormany*, 2022 WL 4115232, at *3 ("[A]n ALJ need not specifically use the terms

---

[10]    The transcript places page 16 of the ALJ's decision before page 15. The ALJ's decision as cited falls on pages 31 and 32 of the transcript and no substantive issue regarding page order was raised by either party.

'supportability' or 'consistency' in [her] analysis."). For example, by using language such as "does not reflect" it is clear that she viewed the April 2020 opinion as inconsistent with the broader record of treatment, which contemplated much more than the immediate post-surgery period. Tr. 32. Likewise, it is clear from the ALJ's decision that she evaluated Dr. Bocks' treatment records in particular to consider whether they supported the limitations in his April 2020 opinion. Tr. 32 (citing some of Dr. Bocks' post-surgery medical records). And while the ALJ could have spent more time or gone into greater detail describing her analysis of this opinion, she was not required to do that—it is apparent that the limitations Dr. Bocks described were specifically related to the short-term recovery from a surgical procedure. Tr. 32; *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for [her] decision to stand.").

White also argues that the ALJ improperly rejected Dr. Bocks' April 2021 opinion as unpersuasive. This argument also lacks merit. The ALJ thoroughly articulated both that Dr. Bocks' April 2021 opinion lacked relevance because it was offered using a pediatric cardiology form and that it was otherwise unsupported and inconsistent. Tr. 31–32. White appears to argue that the ALJ's finding that the April 2021 opinion lacked relevance was improper, but she does not provide support for this contention.

Additionally, White argues that the ALJ should have considered the substance of Dr. Bocks' April 2021 opinion "with the record as a whole." But the ALJ did this. Despite finding the *pediatric* cardiology form to be irrelevant to the evaluation of an *adult* residual functional capacity, the ALJ proceeded to identify specific pieces of evidence and patterns of symptoms throughout White's treatment records that showed why the April 2021 opinion was unpersuasive. Tr. 32. For example, as to supportability, the ALJ identified that Dr. Bocks' own treatment records reflected that White sometimes had shortness of breath, sometimes was doing well, and "often noted the claimant to have no symptoms." Tr. 32. And, as to consistency, the ALJ articulated that the record showed "no indication that her symptoms were affecting her ability to complete all of her daily activities . . . and that in December 2020 she had returned to her normal activities." Tr. 32 (citing Exhibit 5F, page 12). By looking to both the treatment record as a whole and to Dr. Bocks' records in specific to weigh the persuasiveness of his April 2021 opinion, the ALJ complied with the applicable regulations.

White next argues that the ALJ engaged in a "selective reading of the record" to find that Dr. Bocks' September 2021 physical RFC assessment was unpersuasive. Doc. 9, at 16. This argument again lacks merit. An ALJ is not required to explicitly cite all evidence that she considered, *Thacker*, 99 Fed. App'x at 665, and the threshold for the substantial evidence standard is not

high, *Biestek*, 139 S. Ct. at 1154. The ALJ explicitly stated that she considered the entire record in reaching her determination. Tr. 20. Absent evidence to the contrary, the Court will presume that this statement is true. *See NLRB v. Newark Elec. Corp.*, 14 F.4th 152, 163 (2d Cir. 2021); *see also United States v. Chemical Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."). White, however, has not provided anything to contradict this statement.

Additionally, the ALJ's decision appropriately articulates substantial evidence to support her findings related to Dr. Bocks' September 2021 opinion. Tr. 31. For example, the ALJ identified that the limitations in Dr. Bocks' September 2021 opinion were based on White's cardiac testing, shortness of breath on exertion, and palpitations. Tr. 31. However, the limitations opined were "not consistent with her physical examination findings." Tr. 31. She reasoned that no symptoms like "neurological deficits or reduced range of motion" appeared in the record as would be expected to support Dr. Bocks' opined "limited ability to reach, fine manipulate, or gross manipulate objects." Tr. 31. Additionally, the ALJ identified internal contradictions between limitations in Dr. Bocks' September 2021 opinion which he did not explain or support. Tr. 31. The ALJ's decision shows that she considered both how the

September 2021 opinion was supported with Dr. Bocks' own records and explanation (supportability) and how it was inconsistent with other evidence of record (consistency). In so doing, the ALJ complied with the regulations for evaluating medical opinion evidence.

Finally, in support of her first argument, White asserts that the ALJ's evaluation of Dr. Gorodeski's "opinion" was improper in light of governing regulations. Doc. 9, at 16–17. In response, the Commissioner argues that the ALJ did not need to explain the persuasiveness of Dr. Gorodeski's note because it did not amount to a "medical opinion" as defined by the regulations. Doc. 11, at 10. I agree with the Commissioner's evaluation. The evidence White calls Dr. Gorodeski's "opinion" was not a "medical opinion" as that term is defined in the regulations.

The applicable regulations define "medical opinion" as follows:

> A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: (i) your ability to perform physical demands of work activities . . . ; (ii) your ability to perform mental demands of work activities . . . ; (iii) your ability to perform other demands of work . . . ; and (iv) your ability to adapt to environmental conditions[.]"

20 C.F.R. § 404.1513(a)(2). By contrast, "[o]ther medical evidence is evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of your

27

impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." 20 C.F.R. § 404.1513(a)(3).

The cited "opinion," as White has interpreted it, is more appropriately classified as "other medical evidence." *See* Tr. 678. That Dr. Gorodeski memorialized her assessment does not alone convert it to a medical opinion. White points out that Dr. Gorodeski included certain NYHA heart failure classifications to support that her note is a medical opinion. This also is insufficient to create a medical opinion as the regulations define that term. Beyond citation to a certain degree of heart failure, *i.e.*, a diagnosis, Dr. Gorodeski does not include any statement as to what White is capable of doing despite her condition. Nor does Dr. Gorodeski opine whether any restrictions or limitations exist that would address White's ability to perform the physical, mental, or other demands of work activities or adapt to other environmental conditions. Accordingly, the ALJ did not need to assess the supportability or consistency of Dr. Gorodeski's treatment note, and it was properly explained as part of the ALJ's description of the record of medical evidence.[11]

---

[11]     White cites to *Palmore v. Comm'r of Soc. Sec.*, No. 1:20-cv-36, 2021 WL 1169099, at *4 (S.D. Ohio Mar. 29, 2021) to support the following proposition: "When a medical opinion is consistent with and supported by the medical record, it should be given deference." Doc. 9, at 13–14. The cited portion of *Palmore* does not entirely support this broad proposition. *Palmore*, rather, articulates that the ALJ must discuss how she evaluated the factors of consistency and supportability. *Palmore*, 2021 WL 1169099 at *4. It also generally explains that the more consistent or supported an opinion is, the more persuasive it is. *Id. Palmore* does not articulate circumstances in which

*As to her second argument*, White argues that the ALJ improperly interpreted raw medical data, or "played doctor," to reach her RFC determination because no medical provider opined that she was capable of the full range of light work. Doc. 9, at 18–19. The Commissioner disagrees, arguing that the ALJ "fulfill[ed] her legal duty to consider the record as a whole and weigh the evidence in assessing Plaintiff's RFC, which is an administrative finding." Doc. 11, at 11.

The ALJ is not bound to findings contained within a medical source opinion when making her RFC determination. *See e.g.*, *Reeves v. Commissioner of Soc. Sec.*, 618 F. App'x 267, 264 (6th Cir. 2015).  And an ALJ is not required to rely on medical opinion evidence to craft an RFC. *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 22, 226 (6th Cir. 2019) ("No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding."); *Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015) (affirming that "neither the applicable regulations nor Sixth Circuit law limit the ALJ to consideration of direct medical opinions on the issue of RFC"); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (rejecting the plaintiff's argument that the ALJ is required "to base her RFC finding on a physician's opinion").  "A[n] RFC

---

the ALJ should defer entirely to a medical opinion. In any event, *Palmore* is not controlling authority, and I find that the medical opinion evidence has been examined appropriately under the applicable regulations.

determination is a legal finding, not a medical determination, thus, an 'ALJ—not a physician—ultimately determines a claimant's RFC.'" *Peirce v. Saul*, No. 3:23-cv-0248, 2021 WL 606369, at *6 (N.D. Ohio Jan. 25, 2021) (quoting *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) (citing 42 U.S.C. § 423(d)(5)(B)); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009) ("Although physicians opine on a claimant's residual functional capacity to work, ultimate responsibly for capacity-to-work determinations belongs to the Commissioner.") (citing 20 C.F.R. § 404.1527(e)(1)).

It is unclear precisely what raw medical evidence White believes the ALJ interpreted or how the ALJ here could be construed as "playing doctor." Doc. 9, at 18–19. What is clear, however, is that the ALJ evaluated the entire record to reach an RFC determination which is supported by substantial evidence. *E.g.*, Tr. 20, 23.

The ALJ provided a reasonable explanation of the connection between the record of medical evidence and her ultimate RFC determination. As detailed earlier, the ALJ considered multiple opinions regarding White's RFC, including from medical providers (both the state agency consultants and White's treating cardiologist) and the testimony of a qualified VE. Tr. 30–32, 34. The ALJ found, as she was entitled to find, that *all* medical providers' opinions were unpersuasive. Tr. 30–32. She explained, rather, that the entirety

30

of the record showed that White could perform the full range of light work. Tr. 20, 33–35. This determination fell somewhere between the state agency's opinion, which found White capable of the full range of medium work, and the opinion of White's cardiologist, Dr. Bocks, which found greater than light work limitations. In reaching this middle ground, the ALJ appropriately articulated her analysis. Succinctly put, she explained that the state agency's RFC determination was unpersuasive because it had too few functional limitations based on the conditions detailed in the record, Tr. 30, 32, while the Dr. Bocks' opinions were unpersuasive because they included greater restrictions than the record supported. Tr. 31–32.

Additionally, the ALJ explained that her RFC determination was "based on the testimony of the qualified vocational expert who provided testimony at the hearing indicating the claimant could perform those past two relevant jobs." Tr. 34. A vocational expert's response to a hypothetical may constitute substantial evidence, so long as that hypothetical accurately represents the claimant's condition. *Pasco v. Comm'r of Soc. Sec.*, 135 F. App'x 828, 845 (N.D. Ohio Jun. 23, 2005) (citing *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)). And the ALJ identified specific portions of the record which further support her RFC determination. For example, the ALJ found that White had a conservative course of treatment and managed her condition well with medication. Such a finding is not novel and "suggests the absence of

a disabling condition." *See Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 678 (6th Cir. 2013); *see also Metz v. Kijakazi*, No. 1:20-cv-2202, 2022 WL 4465699, at *8 (N.D. Ohio Sept. 26, 2022). That the ALJ considered White's treatment "conservative" does not amount to playing doctor and has White provided support for such argument.

So the ALJ adequately explained her analysis of the medical evidence and demonstrated that substantial evidence supports her RFC determination. White has not demonstrated any flaw in the ALJ's analysis of the facts or compliance with applicable regulations sufficient to justify remand. White's challenge thus fails.

For the reasons explained above, I affirm the Commissioner's decision.


IT IS SO ORDERED.


Dated: March 14, 2024

<div style="margin-left:50%">

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

</div>